# Ex. J



ORRICK, HERRINGTON & SUTCLIFFE LLP
666 FIFTH AVENUE
NEW YORK, NEW YORK 10103-0001

tel +1 212-506-5000
fax +1-212-506-5151
WWW.ORRICK.COM

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY-CLIENT COMMUNICATION**
**ATTORNEY WORK PRODUCT**

MEMORANDUM

To            Michael Putetti, Esq.

From       Aimee B. Florin, Esq.

Date       June 5, 2009

Re          Kaitlin Krause

---

This memorandum summarizes the results of a factual investigation I conducted into allegations raised by Kaitlin Krause, a Senior Specialist who works on Merrill Lynch's Emerging Europe Sales Desk ("EE Sales Desk") in Global Equity Markets, of sexually inappropriate remarks and conduct on the trading floor and by extension, the bars located in the Merrill Lynch building where Krause works, which Krause claims created a hostile and abusive work environment and led to her off-hours and off-premises sexual assault by Kenneth Kim, a Director on the Asia Sales Desk, in October 2008. I was not retained to, and thus, did not, investigate Krause's allegations regarding the sexual assault itself, which I understand is the subject of a pending criminal complaint.

## I.      BACKGROUND

On April 23, 2009, I was retained by Merrill Lynch's Law Department to conduct a factual investigation of Krause's claims: (1) that sexually inappropriate remarks and language used by male employees on the trading floor and the cafeteria area off the trading floor – known as the "Canteen" – as well as a male-dominated atmosphere created a hostile and abusive work environment, which environment extended to alcohol-infused settings like the bars in the Merrill building and gave male employees "license to prey" on female employees; (2) that male Merrill employees engaged in inappropriate conduct while on business trips abroad; (3) that Krause and other female employees were advised not to complain to Human Resources about the work environment at Merrill; and (4) that Ken Kim, and another Merrill employee – Samuel Kim (no relation) – harassed Krause before and after the alleged sexual assault by Ken Kim.

Since the alleged sexual assault by Ken Kim in October 2008, both Krause and Kim have been on paid administrative leave and although Krause's attorneys stated initially that she wished to return to work at Merrill, recent correspondence – in which her attorneys detail the allegations set forth herein and seek a settlement from Merrill – indicates otherwise.

OHS East:160561117.1


ORRICK

June 5, 2009
Page 2

## II. INVESTIGATION STEPS

I interviewed the following Merrill employees in person on the following dates[1]:

1. Sandro Berardelli, Associate, EE Sales Desk – April 30, 2009;

2. Simon Davey, Director, Salesperson on Asia Sales Desk – April 30, 2009;

3. Patrick Doyle, Managing Director, Head of Asia Sales Desk – April 30, 2009;

4. Andrea Faber, Vice President, Salesperson on Latin America Sales Desk – May 1, 2009;

5. Devon Gallagher, Vice President, Salesperson on Asia Sales Desk – April 30, 2009;

6. Liann Hack, Director, Salesperson on Asia Sales Desk – April 30, 2009;

7. Christian Howes, Director, Salesperson on Japan Sales Desk – May 1, 2009;

8. Kim Jones, Administrative Employee, U.S. Equities Desk – May 1, 2009;

9. Kristen Kneier Hill, Director, Salesperson on EE Sales Desk – April 30, 2009;

10. Robert Lamprecht, Managing Director, Head of EE Sales Desk – April 30, 2009;

11. Cole Mackay, Director, Salesperson on EE Sales Desk – April 30, 2009;

12. Camilla Morris, Vice President, Salesperson on Asia Sales Desk – April 30, 2009;

13. Rafilwe Motolo, former Associate, EE Sales Desk – May 1, 2009;

14. Bobbie Roque, Administrative Employee, U.S. Derivatives Sales Desk – May 1, 2009;

15. Lauren Seedorf, Sales Assistant, Developed Europe Sales Desk – May 1, 2009;

16. Carmen Schwender, Vice President, Salesperson on Asia Sales Desk – April 30, 2009;

---

[1] For ease of reference, the witnesses are listed in alphabetical order, not by the date on which I interviewed them. Also, with the exception of Rafilwe Motolo, all of the individuals listed are current Merrill employees.

OHS East:160561117.1


ORRICK

June 5, 2009
Page 3

    17.    Angela Shaw, Sales Assistant, Asia Sales Desk – April 30, 2009.

I also interviewed the following Merrill employees via telephone on the following dates:

1. Michelle Aiello, Administrative Employee, Wealth Management (formerly employed on Developed Europe Sales Desk) – May 1, 2009;

2. Richard Boseley, Managing Director, Head of Equity Sales, Asia Pacific, now based in Hong Kong (formerly Head of Asia Sales Desk in NY) – May 4, 2009;

3. Samuel Kim, Associate, Equity Sales Desk, based in Korea at all relevant times – May 5, 2009;

4. Vielchka Mansukhani, Vice President, Salesperson on Latin America Sales Desk – May 4, 2009;

5. Simon Rebbechi, Managing Director, Head of Australia Desk, now based in Australia (formerly lead on Australia Sales Desk in NY) – May 4, 2009;

6. Ben Samuels, Managing Director, Head of Sales for EE Sales Desk, now based in London (formerly Head of EE Sales Desk in NY) – May 6, 2009.[2]

Each of the Merrill employees I interviewed was advised to keep the fact and substance of the investigation confidential and not to discuss the investigation with anyone. They were also advised that Merrill's policy strictly prohibits retaliation and that they would not be subject to retaliation for providing information to me. And, if appropriate to the interviewee, they were told that they must abide by Merrill's non-retaliation policy and that retaliation against any person who participated in the investigation was strictly prohibited.

---

[2] Because Krause is represented by counsel, is on an administrative leave from Merrill, and at the time I conducted my investigation, had made a settlement demand in which she indicated that she does not wish to return to work at Merrill, I did not interview Krause. Nor did I interview Ken Kim insofar as he is currently subject to a criminal complaint filed by Krause and is on administrative leave from Merrill. Krause's attorneys identified Richard Boseley, Simon Davey, Richard Davidson, Patrick Doyle, Ken Kim, Samuel Kim, Robert Lamprecht, Simon Rebbechi, "Manny" and "Poppa" from the Canteen and "Jerry" as alleged wrongdoers. Krause's attorneys identified Christian Howes, Kim Jones, Kristen Kneier Hill, Lamprecht, Vielchka Mansukhani, Rafilwe Motolo, "Bobbi" LNU (whom we identified as Bobbi Roque) and Zachary Schwartz as individuals with information to support her claims. As noted above, I interviewed each of these individuals with the exception of: (1) Ken Kim; (2) Richard Davidson and Zachary Schwartz, both of whom are former employees who did not return multiple messages left for them by Ketty Russeva of Merrill's Human Resources Department; (3) "Manny" and "Poppa" from the Canteen, who are not Merrill employees; and (4) "Jerry," whom Krause claims was a member of the "trading team," but who we were not able to identify.

OHS East:160561117.1


**ORRICK**

June 5, 2009
Page 4

Further, with the exception of Boseley, Doyle, Lamprecht and Samuels – who by virtue of their positions (and, in Doyle's case, his personal friendship with Kim) were already privy to information regarding the alleged sexual assault and pending criminal complaint by Krause against Kim – I did not discuss the alleged assault, pending criminal charges or Krause's or Kim's employment status with any of the witnesses.

In addition to these interviews, I reviewed the following documents:

- K. Krause's attorneys' demand letters dated March 13, 2009 and April 15, 2009

- K. Krause executed Offer Letter dated January 4, 2007

- Merrill Lynch "Matter of Respect" Policy, including anti-harassment provisions and Merrill Lynch's complaint procedures

- Confirmation of K. Krause participation in Merrill's "Matter of Respect" training course on January 23, 2007 and "Over the Line" training course on April 3, 2007

- K. Krause 2008 Mid-Year Performance Review

- E-mail from Samuel Kim to K. Krause dated November 2, 2008

### III. SUMMARY OF ALLEGATIONS

As detailed in her attorneys' demand letters, Krause's claims are: (1) that sexually inappropriate remarks and language used by male employees on the trading floor and the cafeteria area off the trading floor – known as the "Canteen" – as well as a male-dominated atmosphere created a hostile and abusive work environment, which environment extended to alcohol-infused settings like the bars in the Merrill building and gave male employees "license to prey" on female employees; (2) that male Merrill employees engaged in inappropriate conduct while on business trips abroad; (3) that Krause and other female employees were advised not to complain to Human Resources about the work environment at Merrill; and (4) that Ken Kim, and another Merrill employee – Samuel Kim (no relation) – harassed Krause before and after the alleged sexual assault by Ken Kim.

#### A. Hostile Work Environment

Krause, through her attorneys, claims that male employees working on the trading floor engaged in "juvenile 'locker room' behavior" at work, including the use of vulgar, profane and sexist language such as the "C" word, as a result of which a "Curse-Jar" was created for the deposit of money for each instance when the "C" word or other profanities were used by male employees.


ORRICK

June 5, 2009
Page 5

She also alleges that "[d]aily sexual taunts were directed at [her] and other female employees by 'Manny' and 'Poppa,' two males of the all-male staff of the cafeteria area off the trading floor known as 'the Canteen,'" including comments about "the bodies of female employees and suggestions of sexual contact." The other female employees she claims these "sexual taunts" and comments were directed at are: Rafilwe Motolo, Kim Jones, Vielchka Mansukhani and Bobbie Roque. Krause also claims that the comments were made in the presence of other Merrill employees. Further, Krause claims that although she complained to a "Managing Director" about the comments, no action was taken to address her concerns. As a result, she asserts that she "was forced to avoid the Canteen entirely to reach the nearest elevators there and compelled to walk a flight of stairs to the next floor to use the elevators."

Krause further asserts that a male member of the "trading team" whom she identifies only as having a name that starts with a "J," possibly "Jerry," and a possible screen name with "Austin" in it, after observing Krause in a black dress, sent her an instant message asking, "Is everything under your dress black as well?"

Finally, Krause alleges that Merrill fosters a "schmooze and booze" culture in which the bars in the Merrill building were used as "de facto ML conference room[s]" and were "alcohol-infused" extensions of the workplace.

### B.     Inappropriate Conduct on Business Trips

Krause claims that "it was commonly known that business trips to Korea included visits to brothel-like settings," including one such visit to which Simon Davey was invited, but left and did not participate in because he disapproved of it. Krause also claims that "employees were encouraged to entertain clients at clubs and bars."

### C.     Krause is Told Not to Complain About Sexual Harassment

Krause alleges that at Merrill she was "never offered any sexual harassment awareness training, such materials were not included in her orientation package, and notices concerning this issue were not posted, resulting in [her] having no knowledge of any relevant policies and procedures."

Further, according to Krause, in or about 2007 and 2008, she and some of her colleagues were urged specifically by Robert Lamprecht, Krause's immediate supervisor, and Richard Davidson, then a Director on the Derivatives Desk, "not to report any matter, presumably including sexual harassment, to ML's human resources personnel because they did not 'want heat on the desk' due to the 'sub-prime mess.'"

Case 1:10-cv-02603-RMB-JLC Document 20-16 Filed 12/21/10 Page 7 of 14


ORRICK

June 5, 2009
Page 6

### D. Krause is Harassed Before and After Alleged Assault by Ken Kim

Finally, per Krause, prior to the alleged sexual assault by Ken Kim in October 2008, he tried to kiss her. Further, she claims that after the alleged sexual assault, Samuel Kim, of Merrill's Korea Sales Desk (no relation to Ken Kim), harassed Krause by e-mailing her and asking her to call Ken Kim.

## IV. FACTUAL FINDINGS

I gathered a significant amount of information from both male and female employees regarding the work environment at Merrill generally and on the international desks specifically, including, but not limited to, the EE Sales Desk and the Asia Sales Desk, and the consensus view of the individuals with whom I spoke is that the environment on the desks is collegial, professional and respectful. The witnesses, both male and female, also stated that they enjoy working at Merrill and they spoke highly of their experience on the desks.

For example, Kristen Kneier Hill stated that she has had a "fantastic experience" at Merrill and that the EE Sales Desk is a "great team environment" that is "very positive" and "extremely professional." Carmen Schwender said that the Asia Sales Desk is an "excellent environment" and that Merrill is "very supportive of women" and the "greatest place she's ever worked." Schwender also described Richard Boseley and Patrick Doyle – about whom Krause complains – as "fantastic mentors." According to Sandro Berardelli, the environment is "very professional" and while the work can be stressful at times, the individuals on the desks never act rudely or inappropriately towards one another.

Simon Davey stated that the environment is "extremely professional and respectful." Liann Hack said that her desk is "very professional," "tame," and "respectful." She also said that people tend to be "extra polite" towards one another. Devon Gallagher noted that the people on the Asia Sales Desk are very "hard-working," "focused," "professional" and have a "good camaraderie." Per Angela Shaw, her desk is "collegial" and "professional." Christian Howes also said that the environment is "collegial" and "professional" as well as "team-oriented," "respectful" and "inclusive."

Lauren Seedorf stated that people are "respectful" of one another despite the fact that the environment can be stressful and that it is a "very comfortable" environment. Bobbie Roque also said that the environment is "very respectful" and Andrea Faber described it as a "friendly environment" that is "very respectful and professional." According to Kim Jones, the environment is "great," people are "treated with dignity" and the morale is extremely high. Cole Mackay described the environment as "highly professional," "collegial," "team oriented" and "supportive." Per Vielchka Mansukhani, the environment is "very positive," "respectful" and

OHS East:160561117.1

ML 00102


ORRICK

"team oriented." Richard Boseley, Simon Rebbechi and Ben Samuels also described the environment as "professional" and "respectful."

### A. Hostile Work Environment

#### 1. Vulgar, Profane and Sexist Language

While many of the individuals with whom I spoke did state that due to the stressful nature of their jobs, employees would occasionally curse out of frustration or anger, they all – men and women alike – denied the use of sexist or sexually inappropriate language by anyone on the desks. And, everyone confirmed that when someone did curse, it was almost always at an inanimate object – *i.e.*, their computer screen, telephone, etc. – or about a particular situation, but was never directed at a co-worker. Nor was the cursing ever gender-based or sexual in nature.

Indeed, all of the individuals with whom I spoke denied having ever heard anyone on the desks use the "C" word, either to refer to a female employee or generally. In fact, many of the employees – male and female – expressed outrage that someone would even claim that word was used on the desks, including, but not limited to, Doyle, Rebbechi and Davey, whom Krause identifies as having used the "C" word themselves.

Kneier Hill, for example, stated that she never had any issues with any of the men on the desk, that inappropriate language was not used on the desk and that she was never made to feel uncomfortable because she is a woman. Morris and Schwender both said that there was "no sexually inappropriate" remarks or conduct at all, as did all of the other women and the men I interviewed.

With regard to Ken Kim specifically, although Morris did report that Kim could sometimes be "rude" to both male and female employees whom he perceived to be "beneath him" in the firm hierarchy, she said it was in no way gender-based. And, none of the witnesses reported hearing Kim use sexually inappropriate or offensive language on the desk, including, but not limited to, the "C" word, either towards Krause or anyone else on the desks. Further, Morris stated that it was her impression that Kim and Krause were "good friends" since they often ate lunch together.

With regard to the alleged "Curse-Jar," only three of the 23 individuals with whom I spoke had any recollection of a "Curse-Jar" being used on one of the desks: Michelle Aiello, Angela Shaw and Richard Boseley, and their recollections were vague at best. Further, in each instance, they recalled it being used for an extremely short period of time (perhaps as little as a few weeks, after which the jar was stolen) on the Asia Sales Desk, a couple of years ago if not longer, and that both men and women participated. And, according to the folks who recalled it being used, it was never intended to address sexually inappropriate language or the use of the "C" word specifically, since they reported that neither was used on the desk.


**ORRICK**

June 5, 2009
Page 8

Finally, contrary to Krause's assertion, no one on the Asia Sales Desk with whom I spoke – including Boseley – recalls Boseley "address[ing] the entire Desk staff about a complaint about the regular use of sexually offensive and inappropriate language."

### 2. Remarks by Canteen Staff

Krause claims that "[d]aily sexual taunts were directed at [her] and other female employees by 'Manny' and 'Poppa,' two males of the all-male staff of the cafeteria area off the trading floor known as 'the Canteen,'" including comments about "the bodies of female employees and suggestions of sexual contact." However, with just two minor exceptions – noted below – all of the witnesses with whom I spoke denied having heard or been on the receiving end of any comments they found to be inappropriate. In fact, the witnesses reported that the Canteen employees were "very friendly," "jovial" and "respectful" and that neither their conduct nor their remarks were in any way offensive or inappropriate. Significantly, this includes three of the four other female employees Krause identifies as having such comments directed at them – Motolo, Jones and "Bobbi" Roque.

Motolo noted that while Manny and Poppa did compliment her occasionally in terms of her dress or how she looked, the comments were always "respectful" and "endearing" and never offensive or objectifying. Roque and Jones both said that they never had any issue with anything Manny or Poppa said to them and they found them to be "very respectful." And, while Mansukhani did report that the men in the Canteen would occasionally "compliment her," and she found it "a bit inappropriate," she also said that they are generally "nice guys" who were trying to be "complimentary" and their remarks – *i.e.*, "you look nice today" – were "mild."

Further, contrary to Krause's assertion, Kneier Hill, Mansukhani and Rob Lamprecht all denied that she ever complained to them about the alleged conduct in the Canteen. Christian Howes did, however, state that he thought that Manny may occasionally "cross the line" in terms of being overly complimentary to the female employees, and that Krause did complain to him about it on one occasion approximately a year ago. However, Howes also said that he advised Krause to speak to Manny or to her managers about it, after which Krause reported to him that the comments had stopped. And no one – including Howes – witnessed Krause "avoid[ing] the Canteen entirely to reach the nearest elevators there and [being] compelled to walk a flight of stairs to the next floor to use the elevators" or reported that she told them she was "forced" to do so to avoid the Canteen.

### 3. Black Dress Remark

Because Krause is unable to identify the individual whom she claims sent her an instant-message asking "Is everything under your dress black as well?" on a day when she was wearing a black dress, I was unable to address this allegation. However, none of the witnesses with whom I

OHS East:160561117.1


**ORRICK**

June 5, 2009
Page 9

spoke reported that Krause complained to them about such a comment. Nor did any of the female witnesses with whom I spoke report that they ever received similar inappropriate instant-messages from male co-workers.

In summary, I do not believe that the environment on the international desks, including the EE Sales Desk and the Asia Sales Desk, is in any way offensive, hostile or abusive to women. Nor do the women and men who work on the desks believe that it is. As for the Canteen, while it is worth noting that two individuals with whom I spoke – Howes and Mansukhani – did describe some of the comments made by the Canteen staff as "a bit inappropriate," based on what all of the other witnesses told me, I likewise do not believe that the environment at the Canteen rises to the level of a hostile environment as a matter of law.[3]

### 4. "Schmooze" and "Booze" Culture

As for Krause's claim that Merrill fosters a "schmooze and booze" and "alcohol-infused" culture in which the bars in the Merrill building were used as "de facto ML conference room[s]" and thus, were extensions of the workplace in which the environment was also abusive and hostile to women, I found no evidence to support such a claim.

To the contrary, in addition to consistently describing the culture on the desks as "professional" and "respectful," the witnesses with whom I spoke indicated that there was a very limited amount of socializing after hours. Indeed, numerous witnesses stated that at most they would have social gatherings a few times a year, with many noting that they could not remember the last time they got together after work. And, to the extent they did socialize after work, no one engaged in hostile or inappropriate behavior.

Further, the witnesses also denied that employees engaged in excessive drinking at these events and indicated that when they did have a social gathering, it was typically short-lived, lasting just an hour or two, insofar as many of the individuals on the desks were married with families or in relationships and thus, did not want to stay out late.

The witnesses also denied Krause's claim that the bar in the Merrill building is a "workplace extension" and a "de facto [Merrill] conference room," noting that on the rare occasions when they would socialize after work at the bar in the building, they did not consider themselves to be working or engaging in Merrill business.

---

[3] Of note, a number of the witnesses with whom I spoke – female and male – identified Krause (without my solicitation) as having engaged in overtly social behavior with some co-workers and on some occasions, engaging in somewhat inappropriate behavior herself.

OHS East:160561117.1



**ORRICK**

June 5, 2009
Page 10

Lamprecht, in particular, denied Krause's assertion that he gave her 2008 performance review while at a bar in Merrill's building. In fact, Lamprecht noted that while he may have mentioned to Krause in passing while they were at a social gathering in October 2008 that she was making some positive progress with regard to the action items set forth in her 2008 mid-year review, he and Samuels did give Krause a formal review in the summer of 2008. Lamprecht recalls the review meeting well because he and Samuels raised a number of concerns about Krause's performance and potential violation of Merrill policies and procedures, including her attempt to bypass Merrill's firewall to obtain access to the Facebook website and her encouraging another employee to violate Merrill's expense account policy by fabricating part of a report.

Also, although I was unable to substantiate Krause's assertion that she was introduced to Brent Clapacs – whom she describes as "a Managing Director for Equity Sales and Trading for North America and Europe" – at a bar during the summer of 2008, even if she was, Krause herself does not claim that anyone engaged in hostile or inappropriate conduct during such introduction.

Based on the foregoing, I found no evidence to suggest that the employees on the international desks engaged in excessive socializing and drinking with one another, that the environment or culture at Merrill was "alcohol-infused" or that the bars in the Merrill building constituted "de facto conference rooms" or a "workplace extension." Nor did any of the witnesses with whom I spoke – male or female – report any hostile, unwelcome or inappropriate behavior at any social gathering of Merrill employees.

    **B.**    **Inappropriate Conduct on Business Trips**

Contrary to Krause's assertion, Davey denied that "it was commonly known that business trips to Korea included visits to brothel-like settings" or that during one such visit to which Davey was invited, he left and did not participate because he disapproved of it. Rather, all of the witnesses with whom I spoke, including numerous men and women who travel frequently – including to Asia – denied ever making such visits.

And, while Boseley did mention that there is a "geisha culture" still in existence in Korea and Japan, to which Krause may be referring, he made clear that it is in no way "brothel-like" or sexually inappropriate in nature. He also noted that Merrill has had a "zero tolerance" dating back "many, many years" with regard to sexually inappropriate settings, including strip clubs and other such locations, and that any such visits are strictly prohibited. Lamprecht and Mackay also mentioned the strict "zero tolerance" policy and expressed disbelief, along with a number of other witnesses – male and female – that someone would even suggest that Merrill employees were visiting "brothel-like settings" while on business trips. The witnesses also consistently denied Krause's allegation that "employees were encouraged to entertain clients at clubs and bars."

OHS East:160561117.1



**ORRICK**

June 5, 2009
Page 11

Indeed, Merrill's "Matter of Respect" policy, which Krause received along with anti-harassment training, strictly prohibits, among other types of activities, "visiting entertainment establishments with sexually oriented entertainment" and makes clear that employee visits to such establishments "will not be tolerated at Merrill Lynch." (*See* Merrill Lynch "Matter of Respect" Policy.)

In conclusion, I found no evidence to support Krause's claims that Merrill employees engaged in inappropriate behavior on business trips or that entertaining clients at clubs and bars was encouraged by Merrill.

### C. Krause is Told Not to Complain About Sexual Harassment

Similarly, I found no evidence to support Krause's claim that she was told not to complain to Human Resources about sexual harassment. Lamprecht, whom she identifies as one of the individuals who told her this in 2008, expressly denied it. Rather, what Lamprecht recalls he may have told her during her 2008 mid-year review had nothing to do with Human Resources or complaints she might have about conduct towards her. Instead, Lamprecht believes he may have told Krause that her own actions in potentially violating Merrill policies and procedures had brought unwanted attention to the desk from the Compliance Department and that going forward, she needed to conduct <u>herself</u> appropriately so as to avoid inviting further unwanted attention from Compliance.

Richard Davidson, the other individual Krause identifies as having told her in 2007 not to complain to Human Resources about sexual harassment, is a former employee who has not returned calls from Human Resources regarding this matter. Therefore, I have been unable to substantiate her allegation with regard to Davidson. Regardless, however, because Davidson – with whom Krause allegedly had a consensual sexual relationship during his employment – worked on a different desk and was not in a supervisory relationship to Krause, even if he did advise her not to raise work-related concerns to Human Resources, his doing so is of little legal consequence. This is particularly true insofar as, contrary to Krause's assertions, Merrill's records confirm that she did in fact receive Merrill's anti-harassment policy and complaint procedure and participated in training courses regarding same. (*See* Merrill Lynch "Matter of Respect" Policy, including anti-harassment provisions and Merrill Lynch's complaint procedures; Confirmation of K. Krause participation in Merrill's "Matter of Respect" training course on January 23, 2007 and "Over the Line" training course on April 3, 2007.)

Further, Krause's claim that she complained to Howes about comments from the men working in the Canteen – which Howes confirmed as having been in the spring of 2008 – demonstrates that she knew how to complain to individuals at Merrill other than those in Human Resources. However, by her own account – and the account of all the witnesses with whom I spoke – other than this one discussion with Howes regarding the Canteen, at no time did Krause raise any

ML 00107


**ORRICK**

June 5, 2009
Page 12

concerns to anyone at Merrill about the language on the desk, the environment during social gatherings or any other alleged unwelcome, inappropriate or hostile comments or conduct.

Her failure to do so is particularly telling insofar as according to Samuels, who hired Krause in January 2007, he mentored her very closely and she opened up to him personally, telling him just one week after she was hired that she had an eating disorder. She also advised Berardelli that she had engaged in consensual oral sex with Davidson while she had a boyfriend – and sought Berardelli's advice (while at work) about whether she should tell her boyfriend. Yet, as with the other witnesses with whom I spoke, Samuels and Berardelli both confirmed that Krause never raised with them any issues of inappropriate or hostile comments or conduct on the desks or at social gatherings attended by Merrill employees, by Ken Kim or anyone else at Merrill.

In summary, I found no evidence to support Krause's claim that she was told not to complain to Human Resources about sexual harassment. Further, her history of speaking openly about personal matters to co-workers and members of management at Merrill suggests strongly that she would have felt comfortable complaining about hostile or inappropriate remarks or conduct by Merrill employees had they occurred. Her failure to do so suggests to me that no hostile or inappropriate remarks were made or such conduct engaged in, at least as she is now describing same.

### D. Krause is Harassed Before and After Alleged Assault by Ken Kim

None of the witnesses with whom I spoke stated that they had witnessed Ken Kim attempt to kiss Krause. Nor, as set forth in more detail above, *see*, *supra*, at 7, did anyone report any sexually inappropriate comments or conduct by Kim directed towards Krause or any other employee. And, it is my understanding that Human Resources has confirmed that other than Krause's current complaint, they have not received any complaints, formal or otherwise, about Kim.

As for Krause's claim that after the alleged sexual assault, Samuel Kim, of Merrill's Korea Sales Desk (no relation to Ken Kim), harassed her by e-mailing her and asking her to call Ken Kim, I did confirm that on November 2, 2008, Samuel Kim sent Krause an e-mail asking her to "give Ken Kim a call." (*See* E-mail from Samuel Kim to K. Krause dated November 2, 2008.)

Further, when I questioned Samuel Kim (who was extremely nervous during our call) about why he sent Krause that e-mail – after he advised me that he does not know her – I found him to be less than credible. Specifically, he first denied that Ken Kim asked him to send it to her – although he did admit that he considers Ken to be "a friend" – but when pressed, he said that he "doesn't think" Ken asked him to send it. And, he said that he does not recall the details, but believes that "someone other than Ken" was looking for Krause and contacted him via Bloomberg and asked him to send her the e-mail. Because, however, his e-mail specifically asks Krause to call Ken Kim, his recitation of events simply does not add up.

OHS East:160561117.1


ORRICK

June 5, 2009
Page 13

That said, Samuel Kim is an Associate, not a Director as Krause claims, and thus, his nervousness during our discussion may have been due – at least, in part – to his junior status with Merrill. And, even if Samuel Kim did send Krause the e-mail at Ken Kim's request, I found no evidence to suggest that Samuel Kim was aware of the alleged sexual assault or that Samuel Kim sent the e-mail to Krause in an effort to "harass" her. Finally, it is my understanding that at least to date, Merrill has been unable to locate any other communications between Samuel Kim and Krause or between Samuel Kim and Ken Kim about Krause.[4]

---

[4] Samuel Kim also denied Krause's allegation that he visited a "brothel-like" setting with Merrill employees in Korea, although he did admit to having visited a dance club with a client on at least one occasion. He stated, however, that there was no inappropriate conduct at the club and that female employees from the Merrill office in Korea participated as well and never raised any issues regarding the outing. Unlike his statements regarding the e-mail to Krause, I did find Samuel Kim to be credible on this point.

OHS East:160561117.1